O

# United States District Court
# Central District of California

| | |
|---|---|
| JELBER EDIVETH DIAZ OSORIO,<br><br>　　　　　　　Petitioner,<br><br>　　v.<br><br>TIMOTHY S. ROBBINS et al.,<br><br>　　　　　　　Respondents. | Case № 26-cv-00757-ODW (AGRx)<br><br>**ORDER GRANTING *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE [2]** |

## I.　　INTRODUCTION

Petitioner Jelber Ediveth Diaz Osorio brings a petition for a writ of habeas corpus against Respondents Timothy S. Robbins, Director of Los Angeles Field Office of Immigration and Customs Enforcement ("ICE"); Todd Lyons, Acting Director of ICE; U.S. Department of Homeland Security ("DHS"); Kristi Noem, Secretary of the DHS; David Marin, Warden of Adelanto ICE Processing Center; and Pamela Bondi, U.S. Attorney General.  (Pet. ¶¶ 12–18, Dkt. No. 1.)  Petitioner also moves *ex parte* for a temporary restraining order requiring his immediate release from custody.  (Ex Parte Appl. ("TRO") 15, Dkt. No. 2.)  Respondents fail to timely oppose the request.  For the reasons discussed below, the Court **GRANTS** the TRO.

## II. BACKGROUND

Petitioner is a citizen of Colombia. (Pet. ¶ 20.) On March 23, 2023, he arrived in the United States to seek asylum along with his now spouse, Luisa Fernanda Paz Cuellar, and their infant child. (*Id.* ¶ 22.) That same day, Respondents arrested Petitioner and his family. (*Id.*) On March 26, 2023, Respondents released them. (*Id.*) Respondents required Petitioner to enroll in the Intensive Supervision Appearance Program ("ISAP") and check-in with ICE. (*Id.* ¶ 24.) Respondents later placed Petitioner in removal proceedings pursuant to 8 U.S.C. § 1229a. (*Id.* ¶ 23.)

On April 13, 2023, Petitioner appeared at ICE's office as instructed. (*Id.* ¶ 25.) ICE then scheduled Petitioner for monthly in-person visits at the ISAP office and instructed him to take a picture of himself and send it to ICE weekly via a monitoring application. (*Id.*) Petitioner complied with Respondents' instructions. (*Id.* ¶ 26.)

On June 16, 2023, Petitioner and his family relocated to Santa Clara, California. (*Id.* ¶ 27.) ICE then instructed Petitioner to attend monthly check-ins at the ISAP office and continue to send pictures of himself to ICE. (*Id.*) Petitioner continued to comply with all his monitoring requirements. (*Id.* ¶ 28.)

In April 2024, Petitioner and his family relocated again. (*Id.* ¶ 28.) ICE then instructed Petitioner to present himself in person at the ISAP office in Camarillo, California. (*Id.*) When Petitioner appeared at the ISAP office, ICE placed a wrist monitor on him. (*Id.*) ICE instructed Petitioner to start taking and sending pictures of himself with the wrist monitor on a weekly basis. (*Id.*) ICE scheduled Petitioner for monthly in-person visits at the ISAP Camarillo office. (*Id.*)

On March 17, 2025, ICE removed Petitioner's wrist monitor and instructed him to continue sending pictures of himself via the monitoring application. (*Id.* ¶ 29.) ICE told Petitioner they would contact him by phone every fifteen days, and Petitioner was required to be at home when the call occurred. (*Id.*) ICE also required Petitioner to attend in-person check-ins at the ISAP field office every fifteen days. (*Id.*)

Petitioner complied with all requirements of his release. (*Id.*) However, starting in April 2025, Petitioner began experiencing issues with the monitoring application. (*Id.* ¶ 30.) On a few occasions when Petitioner tried to send his pictures, he received an error stating that his face was not detected. (*Id.*) Whenever this happened, Petitioner contacted his assigned ICE officer by phone and informed her of the problem. (*Id.*) Petitioner also went in person to the ISAP office to complain about the application issues. (*Id.*) Petitioner's assigned ICE officer always acknowledged that the application might have technical problems and told Petitioner that he was still in compliance with the monitoring program. (*Id.*)

Petitioner also continued to actively work on his immigration case. (*Id.* ¶ 31.) Specifically, Petitioner filed an asylum application with the San Francisco immigration court. (*Id.*) He later applied for and obtained employment authorization and social security card. (*Id.*) Petitioner and his spouse began working as full-time delivery drivers, which permitted them to cover the household expenses and save money for an immigration attorney. (*Id.* ¶ 32.)

On December 23, 2025, Petitioner appeared for his scheduled check-in at the ISAP office. (*Id.* ¶ 33.) At the end of that visit, Petitioner was instructed to appear at the ICE office in Camarillo. (*Id.*) Petitioner complied and appeared at the ICE office to what he believed to be a routine check-in. (*Id.*) However, upon his arrival, ICE detained Petitioner. (*Id.*) Prior to Petitioner's re-detention, ICE did not provide him with notice of the revocation of his parole. (*Id.* ¶ 34.) As of the date of this Order, Petitioner has not received a hearing before a neutral decisionmaker to determine if his re-detention is justified. (*Id*. ¶ 35.)

Based on these allegations, on January 24, 2026, Petitioner filed a Petition for Writ of Habeas Corpus on the grounds that his re-detention violates his Fifth Amendment right to due process. (*Id.* ¶¶ 48–51.) That same day, Petitioner filed this Application for a Temporary Restraining Order. (TRO.) Petitioner requests that the Court order Respondents to immediately release Petitioner from custody. (*Id.* at 15.)

### III. LEGAL STANDARD

A temporary restraining order ("TRO") is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The standard for issuing a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Pursuant to Federal Rule of Civil Procedure ("Rule") 65, a court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). To obtain relief, a plaintiff must meet the "*Winter*" factors: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

### IV. DISCUSSION

The Court briefly addresses its jurisdiction to review Petitioner's claims, before turning to the merits of the TRO.

**A.  Jurisdiction**

The Court must first consider whether it has jurisdiction to review Petitioner's TRO. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction."). Under 8 U.S.C. § 1252(g), a court does not have jurisdiction to review "any cause or claim" challenging the execution of "removal orders." However, a "district court may consider a purely legal question that does not challenge" the execution of a removal order. *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004).

Here, Petitioner raises a question of law as to whether his re-detention complies with due process and there is no underlying final removal order in this case. (*See generally* TRO.) As such, the Court does not review the Attorney General's authority

to execute removal proceedings. Instead, the Court confines its analysis to the narrow legal question properly before it: whether Petitioner's re-detention violates his right to due process. As the Court addresses only the legality of Petitioner's re-detention, the Court has jurisdiction to review Petitioner's TRO. *See Hovsepian*, 359 F.3d at 1155.

Moreover, under 28 U.S.C. § 2241, the Court has authority to adjudicate a habeas corpus petition alleging that a person is being held in custody "in violation of the Constitution or laws or treaties of the United States." "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Here, Petitioner alleges that his re-detention without notice and a pre-deprivation hearing before a neutral decisionmaker violates his constitutional right to due process. (Pet. ¶¶ 48–51.) Thus, Petitioner also properly invokes the Court's habeas jurisdiction.

**B.    Merits of the TRO: *Winter* Factors**

Having determined that the Court has jurisdiction over Petitioner's TRO, the Court now turns to its merits under the *Winter* factors.

*1.    Likelihood of Success on the Merits*

The first *Winter* factor "is the most important," and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Petitioner argues that he is likely to succeed on the merits because his detention violates his due process rights. (TRO 7.) He contends that "[d]ue process requires Respondents to afford Petitioner a hearing before a neutral decisionmaker where ICE is required to justify re-detention *before* it occurs." (*Id.*)

In evaluating similar due process claims, courts employ the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017). Under *Mathews*, courts evaluate (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation; and

1  (3) the Government's interest and the fiscal and administrative burdens that the
2  additional or substitute procedural requirement entail. *Mathews*, 424 U.S. at 335.

        a)    <u>Private Interest</u>

Petitioner argues that he "has an exceptionally strong interest in freedom from physical confinement." (TRO 8.) The Court agrees.

The Fifth Amendment protects all persons from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is settled law that noncitizens within the United States are entitled to due process "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of [removal] proceedings."). The government's release of an individual from detention creates "an implicit promise' that the individual's liberty will be revoked only if they fail to abide by the conditions of their release." *Calderon v. Kaiser*, No. 25-cv-06695-AMO, 2025 WL 2430609, at *2 (N.D. Cal. Aug. 22, 2025) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

When Petitioner was released on parole from his initial detention, he acquired a liberty interest which entitles him to due process. *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty."). As Petitioner has an interest in continued liberty, the procedures used against him must adequately protect that interest. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (noting that a noncitizen "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Here, Respondents re-detained Petitioner without notice or a pre-deprivation hearing. (TRO 2); *see Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1033 (N.D. Cal. 2025) (holding that a noncitizen has a "constitutional right to a hearing before a neutral

decisionmaker prior to any future detention"). Thus, Petitioner has a strong interest in his liberty, and any deprivation of that interest must comport with due process.

### b) Risk of Erroneous Deprivation

Petitioner argues that his re-detention without a pre-deprivation hearing results in a high risk of erroneous deprivation. (TRO 10–11.) The Court agrees.

Where an individual "has not received any bond or custody redetermination hearing, the risk of an erroneous deprivation of liberty is high." *Pablo Sequen v. Albarran*, No. 25-cv-06487-PCP, 2025 WL 2935630, at *11 (N.D. Cal. Oct. 15, 2025) (citation modified). Civil immigration detention, which is "nonpunitive in purpose and effect," is justified only when a noncitizen presents a risk of flight or danger to the community. *See Zadvydas*, 533 U.S. at 690.

Here, Petitioner was released on parole after Respondents determined that he was not a flight risk or danger to the community. (Pet. ¶ 1.) Before his re-detention, Petitioner did not receive notice of Respondents' intention to re-detain him and had no opportunity to contest Respondents' action. (*See id.* ¶ 5; TRO 2.)

Moreover, ICE arrested Petitioner during a scheduled check-in. (Pet. ¶ 33.) Respondents' belief that they had a valid reason to detain him does not eliminate their obligation to effectuate the detention in a manner that comports with due process. *See M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1036 (N.D. Cal. 2025) ("[A]bsent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due process."). As Petitioner has not been provided notice and a pre-deprivation hearing to determine whether his re-detention is warranted based on flight risk or danger to community, the Court finds that the risk of erroneous deprivation is high.

### c) Respondents' Interest

Finally, Respondents' interest in re-detaining Petitioner's without first providing him with notice and a custody hearing is minimal. Respondents could not identify any "legitimate interest that would support detaining [Petitioner] without a pre-detention

hearing." *See Calderon*, 2025 WL 2430609, at *4. Nor can Respondents claim that providing a pre-detention hearing would be an administrative or financial burden. *Id.*

In sum, the Court finds that Petitioner has shown that, under *Mathews*, he was entitled to notice and an opportunity to be heard before Respondents re-detained him. As Respondents failed to provide Petitioner with notice and a pre-deprivation hearing, Petitioner has shown a likelihood of success on the merits of his due process claim.

2.  *Likelihood of Irreparable Harm*

As to the second *Winter* factor, Petitioner contends that he will suffer irreparable harm in the absence of a TRO because he will continue to be unlawfully detained and separated from his family and friends. (TRO 13–14.)

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "[I]n cases involving a constitutional claim, a likelihood of success on the merits usually establishes irreparable harm." *Baird*, 81 F.4th at 1048.

As discussed above, Petitioner brings a due process claim which is likely to succeed on the merits. Thus, the Court finds that he has established irreparable harm, and the second *Winter* factor also weighs in favor of temporary injunctive relief.

3.  *Balance of Equities and Public Interest*

The last two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Public interest concerns exist "when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). "[T]he public has a strong interest in upholding procedural protections against unlawful detention," and "in the efficient allocation" of resources. *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020).

The balance of hardships tips strongly in Petitioner's favor as he would suffer great hardship if the Court were to deny his TRO. *See Winter*, 555 U.S. at 26

(requiring the balance of hardships to "tip strongly" in the moving party's favor). Specifically, Petitioner would continue to be detained for an indefinite amount of time without due process. (TRO 14.) Should Petitioner remain detained without due process, "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022). Thus, the balance of equities and the public interest factors also favor injunctive relief.

Having found that all *Winter* factors weigh in favor of injunctive relief, the Court **GRANTS** Petitioner's TRO.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Petitioner's TRO. (Dkt. No. 2.) It is hereby **ORDERED** that:

- Respondents shall **IMMEDIATELY RELEASE** Petitioner;
- Respondents are **ENJOINED** from re-detaining Petitioner absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice and a hearing before a neutral arbiter. At any such hearing, Respondents shall bear the burden of establishing that Petitioner poses a risk of flight or danger to the community; and
- Respondents shall **SHOW CAUSE**, in writing only, to be received by the Court no later than **February 3, 2026**, as to why the Court should not issue a preliminary injunction in this case. Petitioner may file a reply by **February 6, 2026, at 10:00 a.m.** The Court **SETS** a hearing on the preliminary injunction for **February 10, 2026, at 10:00 a.m.**, via Zoom.

**IT IS SO ORDERED.**

January 27, 2026

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE